**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BETHANY JOHNSON** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**CAROLYN W. COLVIN,** )<br>**COMMISSIONER OF SOCIAL SECURITY,** )<br>)<br>)<br>**Defendant.** ) | **Civil Action No. 13-240E** |

## OPINION

### I.  Introduction

Pending before this Court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the claims of Bethany Johnson ("Plaintiff" or "Claimant") for benefits under Title II ("Social Security Disability Income")("SSDI") of the Social Security Act, pursuant to 42 U.S.C. § 1382(c)(3) (2013). Plaintiff argues that the decision of the Administrative Law Judge ("ALJ") was erroneous and contrary to law [See ECF No. 1 at 2]. As such the Plaintiff requests that benefits be awarded to Plaintiff retroactive to the date of initial disability [ECF No. 1 at 3].

To the contrary, Defendant argues substantial evidence supports the Commissioner's decision. "Although Plaintiff had mental and physical impairments, she acknowledged she was working during the period of alleged disability for up to 30 hours per week in a light duty job, spent up to 40 hours per week cleaning her own home, and cared for three children [ECF No. 18 at 1]. Therefore, the ALJ's decision should be affirmed. The parties have filed cross motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

The Court has reviewed the record in its entirety and for the reasons stated below we will deny the Plaintiff's Motion for Summary Judgment and grant the Defendant's Motion for Summary Judgment.

## II. Procedural History

On October 12, 2010 the Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits ("DIB"), alleging disability beginning April 13, 2010 (R. at 12). Plaintiff alleges disability due to repeated right shoulder rotator cuff tear with multiple surgical repairs, post-traumatic stress disorder ("PTSD"), bipolar disorder, mood disorder, obsessive compulsive disorder ("OCD"), attention deficit hyperactivity disorder ("ADHD"), and generalized anxiety disorder [ECF No. 8 at 1]. Plaintiff's claims were denied at the initial level of the administrative review process on February 14, 2011 (R. at 12). On April 7, 2011 Plaintiff requested a hearing (R. at 12). ALJ David F. Brash conducted a *de novo* video hearing on April 4, 2012 (R. at 12) where Plaintiff was in Erie, Pennsylvania and the ALJ was in Mars, Pennsylvania. Present for the hearing was an impartial Vocational Expert ("VE"), William H. Reed, Ph.D. (R. at 12). On May 3, 2012, the ALJ determined that Plaintiff was not disabled under the Social Security Act (R. at 9-21). The Plaintiff filed a timely written request for review by the Appeals Council which was denied on June 11, 2012 (R. at 1-2), making the ALJ's decision the final decision of the Acting Commissioner. An appeal was subsequently filed by Plaintiff who seeks our review of the ALJ's decision.

## III. Medical History

June 15, 2005 Dr. Fuat Ulus of St. Vincent Health Center reported that Plaintiff was referred to the program when Wellbutrin, Lexapro, Xanax and Effexor were ineffective for treating Plaintiff's anxiety, depression and low frustration tolerance. Patient had anxiety and depression

for three years starting during a time of postpartum. She had increased sleep and appetite with weight gain. She was irritable and less social. There was a history of a car accident with head trauma (R. at 294). The St. Vincent report stated Plaintiff has a Current Global Assessment of Functioning ("GAF")[1] of 60-65 (R. at 295). Dr. Ulus ordered an EEG to rule out any neurological problems before entering the psychiatric jurisdiction (R. at 295).

August 2, 2005 Dr. Ulus of St. Vincent Health Center reported that Depakote had really started to help Plaintiff's mood stabilization and anger management. Plaintiff's GAF was 65 (R. at 292).

February 22, 2006, during a visit to St. Vincent Health Center, Plaintiff reported being frustrated, anxious, and depressed. She further reported that her medications were not helping and were all discontinued for a regimen of Topamax (R. at 291).

On August 31, 2006 Plaintiff met with Dr. Ulus at St. Vincent Health Center. She continued on Topamax and agreed to see a counselor for cognitive behavioral therapy and management of her Obsessive Compulsive Disorder ("OCD"), anxiety and other difficulties (R. at 289).

On October 24, 2008 Plaintiff underwent a psychiatric evaluation with Rose Ann R. Flick, CRNP at St. Vincent Health Center. Plaintiff was fearful that she might relapse into a manic episode due to stressors. Plaintiff's GAF was noted at 65-68 and she was reported to be well-groomed and pleasant. Plaintiff was prescribed Topamax for headaches and mood stabilization and Klonopin for anxiety and agitation. Supportive psychotherapy was suggested for herself and her family (R. at 285-288). Diagnostic impressions were: PTSD, adjustment disorder, and Bipolar I affective disorder mixed, mild to moderate (R. at 287).

---

[1] The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and is used by a clinician to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R). The greater the number the higher the functioning of the individual

On November 21, 2008 Plaintiff was seen on an outpatient basis at St. Vincent Health Center. Plaintiff reported doing better at work and said her frustration was gone. She was also sleeping better and was more productive (R. at 284).

On May 11, 2009 Plaintiff was seen on an outpatient basis at St. Vincent Health Center. Plaintiff was feeling overwhelmed and depressed because her son was in trouble with drugs. The assessment had a note of GAF of 60 (R. at 283).

On August 13, 2009 Plaintiff was seen for ADHD and Generalized Anxiety Disorder (GAD). Plaintiff reported that her current medication was not addressing her anxiety. Her dosage of anti-anxiety medication was increased (R. at 282).

On April 28, 2010 Plaintiff was seen at St. Vincent Health Center and reported having difficulty concentrating, focusing, and completing tasks. She was prescribed Adderall (R. at 281).

On April 11, 2010 Plaintiff visited Hamot Medical Center Emergency Department after a slip and fall accident. Plaintiff reported right arm pain for four days since the fall. She was unable to raise her right arm (R. at 309). She was discharged with a diagnosis of Bursitis (R. at 310).

April 21, 2010 Plaintiff had initial visit with Dr. Jeffrey Nechleba regarding her right shoulder pain. X-rays were normal. The Doctor suspected rotator cuff injury and ordered an MRI (R.at 376). In the meantime Plaintiff continued in physical therapy to improve her motion (R. at 377).

On May 4, 2010 an MRI of Plaintiff's right shoulder was performed. "Impression: 1. Supraspinatus Full-Thickness tear at its insertion. 2. Small joint effusion and small amount of fluid within subacromial-subdeltoid bursa." (R. at 320).

On June 3, 2010 Plaintiff underwent surgery for a right shoulder massive rotator cuff tear. The procedure included diagnostic arthroscopy, arthroscopic bursectomy, and mini open repair of massive rotator cuff tear. The anchors were Arthrex 5.5-mm Bio corkscrews for a medial row and then 3 Bio Push-Locs out laterally. Insertion of pain pump catheter into the subcromial extra articular space (R. at 303).

On October 15, 2010 Dr. Jeffrey Nechleba saw Plaintiff for a visit after a fall about a month and a half prior. Plaintiff fell in the first two months after surgery to repair rotator cuff. The Doctor waited to see if the pain would settle after therapy but the pain persisted. Dr. Nechleba performed an MR arthrogram of her right shoulder. The MR was accomplished in the axial, oblique coronal and sagittal planes. There was considerable artifact generated by metallic component of surgical hardware, with anchors noted within humerus. There was fluid seen throughout the subacromial /subdeltoid bursa which would be evidence of a recurrent full thickness or rotator cuff tear. Visualized portions of the rotator cuff were found to be quite attenuated. There was some obscuration by artifact. There was some contrast material within the subscapularis tendon, which was possibly iatrogenic. Labrum was intact as were the biceps tendon and anchor. Findings were consistent with a recurrent full thickness rotator cuff tear (R. at 318). Dr. Nechleba scheduled another rotator cuff surgery (R. at 312).

On November 5, 2010 Plaintiff was seen for outpatient psychiatric treatment at St. Vincent Health Center where she said she was feeling "a little depressed." Plaintiff began taking antidepressant medication (R. at 280, 552).

On November 8, 2010 Plaintiff had a second rotator cuff operation for a re-tear of her rotator cuff (R. at 257). Diagnosis was right shoulder partial thickness articular-sided rotator cuff tear and biceps tear (R. at 257). At the Village Surgicenter, Dr. Jeffrey Nechleba performed

diagnostic arthroscopy with bursectomy and then biceps tenodesis and then mini open rotator cuff repair. Anchors were 3 medial row 6.5 mm Arthrex Bio-corkscrews, PEEK, and then 2 swivel-licks placed laterally for a double-row repair (R. at 257).

Kathy Sullivan provided a report on behalf of Jeffrey A. Nechleba on November 19, 2010. Plaintiff had a post-op appointment after a re-tear of her rotator cuff. Appointment was normal and she was provided with a prescription to begin physical therapy ("PT") the following week (R. at 217).

December 8, 2010 report from St. Vincent's Behavioral Health states that Plaintiff reports she is happy with the Celexa and wishes to continue. Other medications were working well (R. at 551).

December 22, 2010 Dr. Nechleba saw Plaintiff for follow up of her right shoulder redo rotator cuff repair. Her motion was coming along as expected and the pain had settled down. Plaintiff reported carpal tunnel type symptoms in her right hand and a little bit of trapezial pain that they will work on in PT with moist heat (R. at 375).

On February 4, 2011 Lamar Neal, Psy.D. evaluated Plaintiff for the Bureau of Disability Determination. Plaintiff presented with complaints of poor attention and inability to follow directions. She said she becomes uncomfortable in a crowd or around men (R. at 225). She also reported frequent headaches (R. at 226). Plaintiff had been in and out of therapy since 1987. Plaintiff's 2005 disability paperwork reported a diagnostic impression of PTSD and mood disorder (R. at 226). Plaintiff was seeing Psychiatrist Dr. Napoli but was not currently treating with a therapist. During the examination, Plaintiff's eye contact was poor and she was mildly anxious/fidgety (R. at 229). She said she was always angry (R. at 229) and had a history of poor sleep (R. at 230). She also reported repressed feelings with low motivation and withdrawal. She

had ongoing nightmares of past abuse (R. at 230). Dr. Neal reported Plaintiff as having low average intellectual ability. Overall, though, she maintained relatively adequate cognition with mild thought blocking. Her frustration tolerance and persistence were only fair at best (R. at 230).

Dr. Neal had the following impressions: Bipolar II disorder, PTSD - chronic, ADHD (by history only), Chronic Obstructive Pulmonary Disease ("COPD"), edema, and rotator cuff surgery. Plaintiff's GAF was 55 (R. at 231). Dr. Neal found Plaintiff's demeanor to be guarded and she reported to him that she has significant withdrawal. Based on these characteristics he noted, "This may cause her difficulty in managing constructive criticism or a supervisory relationship." (R. at 232). He reported that Plaintiff has low to average intelligence and persistence is lacking due to low frustration tolerance (R. at 233) and is easily overwhelmed (R. at 233). However, the Plaintiff can manage her own benefits and finances (R. at 234). Dr. Neal reported slight to moderate restrictions in work-related mental activities such as understanding and carrying out instructions or making work-related decisions (R. at 233), and moderate restrictions in Plaintiff's ability to interact and respond appropriately in a work setting (R. at 233). Based on the Plaintiff's interview, Dr. Neal stated the prognosis for positive change was considered guarded (R. at 231).

March 2, 2011 Plaintiff attended a follow up visit with Dr. Nechleba after re-tear repair. The Doctor reported she is coming along nicely. Plaintiff's range of motion ("ROM") was improving. She had about 165 degrees of forward flexion, abduction, internal rotation to her lower thoracic. Her strength was a bit weak but Plaintiff was able to give resistance so it could be improved. Dr. Nechleba wanted Plaintiff to continue therapy three times a week for the next six weeks (R. at 379).

A March 4, 2011 report from St. Vincent's Behavioral Health found Plaintiff was doing well on current medications (R. at 550).

On March 10, 2011 Plaintiff went to UPMC Hamot due to right shoulder pain (R. at 322). Hamot Medical Center Department of Radiology performed x-rays. The report indicated an abnormal appearance of the humeral head likely due to pervious surgical intervention. No acute bony abnormalities were suspect (R.at 326). The visit produced a diagnosis of acute right shoulder pain/strain and Plaintiff was instructed to follow up with Dr. Nechleba in five days and was prescribed pain medication (R. at 325).

On March 16, 2011 Plaintiff saw Dr. Nechleba again for increased pain in her shoulder and some decreased motion after being involved in a T-bone motor vehicle accident (R. at 378). After examination, Dr. Nechleba reported that she has a little shoulder strain and directed PT to continue working with that issue. He also ordered PT to turn their attention to neck and lower back modalities for motion and pain control (R.at 378).

Plaintiff visited Bay Harbor Family Medicine on March 30, 2011 complaining of pain to the right shoulder. Her pain radiated to her hand and she could not fully extend, flex, or abduct (R.at 351). Plaintiff had stiffness, swelling, weakness and numbness/tingling of the hand (R. at 351). Bay Harbor Family Medicine referred Plaintiff to Orthopedics (R. at 353). At the time Plaintiff was taking the following medications: Combivent inhalation aerosol, Diclofenac Sodium, Hydrochlorothiazide, and Proventil (R. at 371).

Plaintiff was seen on May 11, 2011 for another rotator cuff follow up. Dr. Nechleba reported that her ROM was coming along nicely. She was about 170/170 lower thoracic and about 60 degrees external rotation. There was fairly good resistance with internal and external rotation with her elbow at her side and also abduction and Jobes position (R. at 381, 577). Doctor

Nechleba said she could use another month of PT but was able to handle returning to work on regular duty basis (R. at 381).

Plaintiff attended PT on a regular basis. The record documents reports from Rehabilitation Systems, Keystone Rehab – Erie West on the following dates: May 11, 2010, May 14, 2010, May 17, 2010, May 18, 2010, May 21, 2010, May 25, 2010, June 22, 2010, June 24, 2010, June 25, 2010, June 28, 2010, June 30, 2010, July 2, 2010, July 7, 2010, July 8, 2010, July 9, 2010, July 12, 2010, July 14, 2010, July 16, 2010, July 19, 2010, July 21, 2010, July 23, 2010, July 28, 2010, July 30, 2010, August 2, 2010, August 3, 2010, August 4, 2010, August 6, 2010, August 9, 2010, August 10, 2010, August 12, 2010, August 16, 2010, August 18, 2010, August 20, 2010, August 23, 2010, August 25, 2010, August 30, 2010, September 1, 2010, September 3, 2010, September 7, 2010, September 8, 2010, September 13, 2010, September 16, 2010, September 17, 2010, September 20, 2010, September 22, 2010, September 30, 2010, October 8, 2010, October 12, 2010, October 19, 2010, March 22, 2011, March 23, 2011, March 25, 2011, March 29, 2011, March 30, 2011, April 1, 2011, April 5, 2011, April 7, 2011, April 8, 2011, April 11, 2011, April 13, 2011, April 20, 2011, April 22, 2011, April 28, 2011, April 29, 2011, May 2, 2011, May 10, 2011, May 19, 2011, May 20, 2011, May 23, 2011, May 25, 2011, June 2, 2011, and June 28, 2011 (R. at 382-548).

In addition, as part of the PT notes, there is a noteworthy letter from Keystone Rehabilitation Systems dated September 20, 2011 which requested that Plaintiff maintain continued insurance coverage. The letter states, "Bethany is a very good patient as she works very hard at trying to get better. She wishes very much to get back to work and we are afraid that if she loses her insurance she would not be able to attend her therapy and therefore not get any better. She would not be able to work with her shoulder as it is now; she needs to continue with her

therapy." (R. at 487). PT was treating for rotator cuff rupture, headaches sprain lumbar region, and sprain of neck after a motor vehicle accident. Due to the added injury of a motor vehicle accident, different modalities were put into place for 3 visits a week for 3 weeks (R. at 437). Plaintiff reported aggravating factors such as: turning head, lifting, pushing/pulling, walking 10-20 minutes, sitting 20-30 minutes, and standing 20-30 minutes (R. at 434).

The following treatments were employed: Exercise activities; aerobic conditioning; range of motion, modalities, and massage. The therapist reported that the Plaintiff required skilled rehabilitative therapy in conjunction with home exercise program to achieve the goals but overall rehabilitation potential was good (R. at 386). Goals were to decrease pain, improve disabilities of arm, shoulder and hand, increase range of motion, musculoskeletal improvements, and correct posture (R. at 386-387). The plan was PT three times a week for eight weeks (R. at 388). The therapist reported that Plaintiff generally would undergo treatment with mild or minimal complaints of pain and difficulty (R. at 397). On April 7, 2011 Plaintiff reported increased right shoulder pain (R.at 413). On April 8, 2011 right shoulder continues to be sore and there is increased edema and soreness with stretching (R. at 416). Plaintiff's condition was unchanged on April 11 and 13, 2011 (R. at 420, 424). May 2, 2011 Plaintiff had increased pain to right low back and there was a palpable spasm (R. at 453). There were also reports which indicated that Plaintiff's overall condition was a little better (R. at 398) and her overall condition continued to improve (R.at 410).

On May 19, 2011 PT reported that Patient stated right shoulder is getting better but still weak and limited at times. Plaintiff had been dealing with injuries from multiple motor vehicle accidents (R. at 461).

A July 20, 2011 report from St. Vincent Behavioral Health reported Plaintiff was doing well on her current medications (R. at 549).

On November 8, 2011 Plaintiff was evaluated by Safe Harbor Behavioral Health as a transfer from St. Vincent Behavioral Health due to St. Vincent closing (R. at 554). She was well groomed with good hygiene (R. at 560). Plaintiff "claims she is doing well on[sic] her current medication and is hoping they will not be changed." (R. at 554). She stated she was being treated for depression, anxiety, and ADHD (R. at 554).

In a January 6, 2012 report from Safe Harbor Behavioral Health, Plaintiff stated that her medications helped her regulate her mood and keep her focused to work (R. at 560). She also stated that, "[D]epression was not bad right now and she does better when staying busy with work and activities." (R. at 560). Plaintiff stated she gets anxious, worried, nauseated, and irritated. She also reported she does not like to socialize (R. at 560) and cannot pay attention for extended periods of time (R. at 560). She was given a GAF score of 56 (R. at 561). Plaintiff's medications were tweaked to improve mood and address her ADHD (R. at 561).

December 23, 2011 Plaintiff saw Dr. Nechleba with some increasing pain in her shoulder. She had a fall at work and says she landed backwards (R.at 576). At the examination she

> has good ROM about 160/160. Internal rotation is lower thoracic and external rotation about 60 degrees. She gives me fairly good resistance with Jobes and O'Brien's test. She has good external and internal rotation with her elbows at her side. She is kind of globally tender in that upper extremity just when I touch around there, there is a little hypersensitivity with pain issues. She is neurovascularly intact distally. She has been complaining of swelling but there is no evidence of swelling today. (R. at 576)

The Doctor reported he thought she just strained or aggravated her rotator cuff (R. at 576).

At her February 1, 2012 appointment with Stairways Behavioral Health, Plaintiff was observed to be friendly, cooperative, mood frustrated at times but generally less anxious and less

11

depressed. Her affect was calm and broad and she had good eye contact. She had a somewhat disheveled appearance. (R. at 563).

Plaintiff was seen on February 17, 2012 for follow up for her right shoulder rotator cuff repair after a fall. The Doctor reported that she seemed to have relief from the subacromial injection. She had some decreased forward flexion and abduction and was tender around her AC joint (R. at 578).

February 22, 2012 Stairways Behavioral Health performed an assessment: Plaintiff is well groomed with good hygiene. Plaintiff's depression was controlled with Celexa. Her appetite was normal and her sleep was typically good. At the time Plaintiff worked second shift, typically went to bed around 11:30pm and woke up at 6:00am to get children ready for school (R. at 566). All her medications were reported as working to help symptoms (R. at 566).

On April 3, 2012 Hamot Medical Center Department of Radiology performed an MRI with contrast for right shoulder pain. The findings were: Contrast material was seen within the glenohumeral joint and extensively throughout the subacromial-subdeltoid bursa. These findings were highly suspicious for recurrent full thickness rotator cuff tear. Post-surgical changes of the proximal right humerous with metal artifacts. There was a sharply circumscribed ovoid presumed to be cystic lesion within the proximal right humeral shaft which was not present previously (R. at 573).

On April 13, 2012 Dr. Nechleba provided restrictions for Plaintiff when returning back to work (R. at 572). His restrictions were no lifting with right arm, no overhead work, and no climbing ladders (R. at 572).

## IV. Summary of Testimony

In her 2010 "Disability Report Field Office Form – SSA3367," Plaintiff, a 39 year old female, reported completing her GED in 1995 (R. at 170). She worked as a personal care attendant and as a cashier at the Country Fair Store (R. at 171). She listed the following as her medications at the time of the report: Adderall, Ambien, Kolonipin, Combivent, Flexerall, hydrochlorothiazide, Percocet, tramadol, Ventolin, and Vicodin (R. at 172). Plaintiff reported her daily activities as follows: "Sleep very little, cleans house most of the day. Excessively cleans. Last several months has lot of pain in right shoulder so limits cleaning. Most sit byself [sic] in kitchen or in living room looking out window. Pain medication make[s] her very drowsy. But only sleep a little at a time. Very anxious." (R. at 190).

Plaintiff reported caring for her children by cleaning, cooking, and washing clothes with assistance from their father (R. at 191). However, Plaintiff also stated she can no longer clean, cook, wash clothes, drive, or work (R. at 191). She said she needed assistance in almost all aspects of personal care with exception of feeding herself (R. at 191). Plaintiff was able to go out alone but would become very anxious (R. at 192). She could not drive due to pain medication (R. at 192).

Plaintiff reported that her illnesses and injuries affected lifting, reaching, walking, sitting, memory, completing tasks, concentration, understanding, following instructions, using her right hand (she is left handed), and getting along with others (R. at 195).

On December 8, 2010 a Physical Residual Functional Capacity ("RFC") Assessment was performed on Plaintiff by Lindsay B. Ross (R. at 78-84). Her primary diagnosis was rotator cuff tear. Plaintiff was found to have the following limitations: She can occasionally lift and/or carry 20 pounds; she can frequently lift or carry 10 pounds; she can stand and/or walk about 6 hours in

an 8-hour workday; she is limited in her upper extremities to push or pull; she is limited in reaching all directions including overhead (R. at 79-82). Based on the medial evidence of record, Dr. Ross found Plaintiff's statements to be partially credible (R. at 8).

In her Disability Determination and Transmittal of February 14, 2011, Dr. Ross found that Plaintiff's restrictions do not allow her to perform past relevant work (R. at 10). However, the RFC has been assessed at a light exertional level work and the mental capacity is limited to unskilled work (R. at 10). Dr. Ross finds jobs allowing for these restrictions exist in significant numbers in the national economy.

On February 14, 2011 a Mental RFC was completed by Edward Jonas, Ph.D. (R. at 235-251). Dr. Jonas did not find Plaintiff to be markedly limited in any category. He found her to be moderately limited in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, her ability to work in coordination with or proximity to others without being distracted by them, her ability to make simple work related decisions, her ability to complete a work day or work week without an unreasonable number of rest periods (would not have a consistent pace), her ability to interact with the general public, her ability to accept instruction or criticism from supervisors, her ability to get along with coworkers, and her ability to adapt to changes in work setting (R. at 235-236). Dr. Jones found the Plaintiff to be partially credible. He gave Dr. Neal's medical evaluation appropriate weight and determined Dr. Neal's report to be partially consistent with the RFC. "Despite the restrictions resulting from the impairment, the claimant would be able to meet the basic mental demands of competitive work on a sustained basis." (R. at 237).

With regard to Functional Limitation, Dr. Jonas found Plaintiff to be mildly restricted in activities of daily living, she has moderate difficulty in maintaining social functioning, she has

moderate difficulty in maintaining concentration, persistence or pace and there is no evidence of decompensation (R. at 249).

## V. *Standard of Review*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. See 42 U.S.C. § 405(g)(2012). This Court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id. "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. See id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. 5 U.S.C. § 706(1)(F) (2012).

## VI. *Discussion*

Under SSA, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ..." 42 U.S.C. §§ 416(i)(l); 423(d)(1)(A); 20 C.F.R. § 404.1505 (2012). A person is unable to engage in substantial activity when:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled under SSA, a five-step sequential evaluation process must be applied. See 20 C.F.R. § 404.1520; McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows: At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i). At step two, the Commissioner must determine whether the claimant has a severe impairment. See id. at § 404.1520(a)(4)(ii). If the Commissioner determines that the claimant has a severe impairment, he must then determine whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, subpart p, Appx. 1. § 404.1520(a)(4)(iii). If the claimant does not have an impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent him from performing his past relevant work. See id. at § 404.1520(a)(4)(iv). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering his residual functional capacity and age, education and work experience. See id. at § 404.1520(a)(4)(v); see also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

In this case, the Claimant asserts that she has been disabled since April 13, 2010, due to her mental health issues and a recurrent rotator cuff tear and argues that the ALJ's decision is not supported by substantial evidence of record [ECF No. 8 at 18]. In support of her motion for

summary judgment, Plaintiff argues that the ALJ did not give proper deference to Plaintiff's physical and mental health symptoms [ECF No. 9 at 1]. More specifically, Plaintiff argues that her mental impairments satisfy the disability criteria of "paragraph B" [ECF No. 8 at 14-15].

Plaintiff, in particular, notes that the ALJ's determination that Plaintiff is only mildly limited in activities of daily living because she is able to clean her house forty hours a week is erroneous and that the obsessive cleaning is a disabling factor rather than evidence of ability to work [ECF No. 8 at 15]. Plaintiff states she is preoccupied with cleaning, which interferes with her ability to conduct all other activities [ECF No. 8 at 15]. "The ability to engage in substantial gainful employment, . . .means the ability to do certain of the the physical and mental acts required in the job; the claimant must be able to sustain the activity through continuous attendance in a regular work week." Dobrowolsky v. Califano, 606 F.2d 403, 408 (3d. Cir. 1979); See Sharp v. Bowen, 705 F.Supp. 1111, 1121 (W.D. Pa. 1989). Plaintiff believes that the ALJ improperly emphasized Plaintiff's ability to perform functions at home and improperly determined that Plaintiff's performance at home could transfer to a work place environment. Activities such as school, hobbies, housework, social activities or use of public transportation cannot be used to show ability to engage in substantial gainful activity. See Frankenfield v. Bowen, 861 F.2d 405 (3d Cir. 1988).

Finally, Plaintiff asserts that the ALJ did not provide any rational basis for finding Plaintiff was not credible [ECF No. 8 at 16]. Plaintiff cites to the record which is replete with evidence of appointments with Dr. Nechleba and PT, as well an MRI report which states, "recurrent full thickness tear of the rotator cuff with development of a cyst within the proximal right humeral shaft." [ECF No. 8 at 16]. All of the medical evidence is supportive of Plaintiff's claims of medical disability.

The ALJ asserts that there is substantial evidence on the record to find that the Plaintiff is not disabled and determined that the Plaintiff maintains a RFC to perform a reduced range of simple, low-stress, light work, with numerous limitations, despite her physical and mental impairments [ECF No. 18 at 9].

The Commissioner relied on the ALJ's determination and uses the sequential evaluation process and determines at step (5) that the Plaintiff has not met her burden of proof that she cannot work in some capacity in the national economy.

> After careful consideration of the entire record, [I] find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except with no climbing of ladders, ropes, and scaffolds; the claimant may not use her non-dominant right arm; the claimant must avoid even moderate exposure to unprotected heights, dangerous moving machinery, or other workplace hazards; the claimant must avoid even moderate exposure to extremes of temperature, wetness, or humidity; the claimant is limited to understanding, remembering, and carrying out simple instructions and performing simple, routine tasks; the claimant is limited to low stress work, which is here defined as work that involves no production rate pace, but rather, only goal oriented work with only occasionally and routine changes in the work setting; the claimant should have no more than occasional work-related contact with supervisors and no work-related contact with co-workers or members of the general public such that her work would be essentially isolated. (R. at 16).

The Commissioner evaluates a disability claim by considering whether the claimant (1) is working; (2) has a severe impairment; (3) has a listed impairment; (4) can return to his past work; and (5) can perform other work. See 20 C.F.R. §§ 404.1520, 416.920. As stated above, in the Commissioner's analysis she reached the question of whether Plaintiff could perform past work or any other work in the economy. At this step the Plaintiff bears the burden of proving that her RFC or limitations are that which do not allow for any work in the national economy. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Matthews v. Eldridge, 424 U.S. 319, 336 (1976). Moreover, the ALJ is not required to uncritically accept Plaintiff's complaints. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011). The ALJ, as fact finder, has

the sole responsibility to weight a claimant's complaints about her symptoms against the record as a whole. See 20 C.F.R. §§ 404.1529(a), 416.929(a).

The Third Circuit precedent provides that the ALJ must analyze all relevant, probative evidence and provide adequate explanation for disregarding evidence. See Fargnoli, 247 F.3d at 41; Burnett v. Commissioner, 220 F.3d 112, 121-22 (3d Cir. 2000); Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). "[T]he ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Plummer, 186 F. 3d at 429.

> Based on his review of all the evidence, and relying upon the testimony of the VE, the ALJ found Plaintiff not disabled under the Act because she retained the ability to perform work that existed in the national economy, including work as a mail clerk (70,000 jobs nationally), security guard (84,000 jobs nationally) and routing clerk (50,000 jobs nationally). (R. at 21).

After review of the record in its entirety and careful review of the ALJ decision, we agree with the Commissioner that the ALJ's decision was supported by substantial evidence. To reach a satisfactory level of "substantial evidence" the ALJ must have more than a scintilla but may have less than a preponderance of evidence supporting his conclusion. "Substantial evidence has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Fargnoli 247 F.3d at 38. We believe the ALJ has met this burden.

With regard to Plaintiff's credibility, an ALJ's findings on credibility must be accorded great weight and deference. See Irelan v. Barnhart, 243 F.Supp. 2d 268, 284 (E.D. Pa. 2003); Stehley v. Astrue, 2012 WL 2572052, at *5 (W.D. Pa. July 2, 2012); Lee v. Astrue, 2012 WL 1004297, at *3 (W.D. Pa. Mar. 23, 2012). Here Plaintiff's complaints of disability simply did not reflect what was consistently stated in the record by the medical professionals and by the

Plaintiff herself. Although Plaintiff's symptoms were consistent with her diagnoses, they were often controlled with medication or had potential for treatment and a good prognosis. Furthermore, there were jobs in the economy that could accommodate the symptoms that Plaintiff experienced both physically and mentally. The ALJ determined the Claimant's testimony was not credible because her claim of disability is at odds with her statements on the record that she wants to return to work on a regular basis and are in contrast with her reported part-time employment and compulsive cleaning of her house (R. at 18).

With regard to Plaintiff's mental capacity, Plaintiff asserts in her brief that she has met "paragraph B" criteria [ECF No. 8 at 15]. To satisfy this criterion the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration (R. at 15). "[T]he ALJ found that Plaintiff's impairments caused only mild restrictions in activities; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation." (R. at 15-16). Plaintiff's medical record does not provide us with even one "marked" restriction in Plaintiff's activities. No medical authority made a "marked" determination and furthermore, there is little evidence of record of an obsessive-compulsive disorder. It appears that Plaintiff's attorney simply makes an unfounded assertion that Plaintiff's OCD with regard to cleaning her house is debilitating. Plaintiff's attorney simply made her own assessment that Plaintiff has a "marked" restriction in this area.

The record simply provides diagnoses of Plaintiff's mental impairments of ADHD, PTSD, generalized anxiety disorders and mood disorders but no medical professional diagnosed

Plaintiff with obsessive compulsive disorder, let alone stated OCD causes Plaintiff to be disabled. The record further provides evidence, in more than one instance, that Plaintiff's mental disorders are effectively treated with medications. While Plaintiff continues to be treated for her mental dysfunction, and her medications are tweaked occasionally, the overall impression given by Plaintiff through the medical reports on the record are that her mental capacity issues are stabilized through her medications. Plaintiff's GAF scores were stable or improved over the relevant time period. The ALJ need only include in the RFC determination a claimant's credibly established limitations. See Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).

In addition, Plaintiff notes to the Court that the record indicates that Plaintiff has a "moderate" restriction in social functioning, but says Plaintiffs difficulty dealing with males was under-evaluated and that the restrictions really are extreme in this area. Again, Plaintiff's own unsubstantiated uneducated determination of a greater restriction is not a consideration for this Court. Plaintiff's attorney's bald-faced statements that her activities are "markedly" restricted is hardly evidence of a mental impairment under "paragraph B".

With regard to Plaintiff's recurring rotator cuff injury, there is certainly evidence of record to support that Plaintiff suffers this injury and has restrictions on her physical ability to use her right arm. However, there is no indication through any of the various reports by Plaintiff's treating Orthopedic Surgeon that she will not recover from this injury. Furthermore, Dr. Nechleba never indicates that Plaintiff is or will be unable to work. In fact, in his last report he releases Plaintiff for work, with restrictions, "no lifting with right arm, no overhead work, no climbing ladders." (R. at 572). These restrictions are accounted for in ALJ's and the Commissioner's determinations.

Plaintiff's medical history reflects ongoing treatment for mental illness and a chronic medical issue with the right rotator cuff. However, absent from the record is any medical authority stating that Plaintiff is unable to work. Plaintiff, despite her mental and physical difficulties, is still able to function in the daily activities of life. Activities of daily living are relevant and may be considered in evaluating a claimant's symptoms. See 20 C.F.R. § 416.929(c)(3)(i). Therefore, based on a view of the medical records and testimony as a whole, we find the ALJ's determination and the Commissioner's subsequent decision to be reasonably sound.

## VII.  Conclusion

For the foregoing reasons, we conclude that there is substantial evidence existing in the record to support the Commissioner's decision that Plaintiff is not disabled, and therefore, the Defendant's Motion for Summary Judgment is granted. The Plaintiff's Motion for Summary Judgment is denied. An appropriate order will be entered.

Date: _May 12, 2014_

_Maurice B. Cohill, Jr._
Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc:    counsel of record